1

2

3

4

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CONFEDERATED TRIBES AND BANDS OF THE YAKAMA NATION,<br><br>                              Plaintiff,<br><br>      v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE; ROBYN THORSON, Pacific Regional Director U.S. Fish and Wildlife Service; CHARLES STENVALL, Manager Mid-Columbia National Wildlife Refuge; LARRY KLIMEK, Manager Hanford Reach National Monument,<br><br>                              Defendants. | NO:  1:14-CV-3052-TOR<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER |

BEFORE THE COURT is Plaintiff's Motion for a Temporary Restraining Order (ECF No. 6). This matter was heard with oral argument on May 5, 2014. Thomas A. Zeilman appeared on behalf of Plaintiff. Vanessa R. Waldref appeared on behalf of Defendants. The Court has reviewed the briefing and the record and

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER ~ 1

files herein, and is fully informed. This Order memorializes and supplements the Court's oral ruling.

BACKGROUND

This case concerns guided bus tours for members of the general public on Rattlesnake Mountain in the Hanford Reach National Monument conducted by Defendant United States Fish and Wildlife Services ("USFWS"). Plaintiff Confederated Tribes and Bands of the Yakama Nation ("the Yakama Nation") seeks judicial review of the USFWS's agency decision and actions that the guided tours will have no adverse effect on the site, which has been designated a Traditional Cultural Property ("TCP") under the National Historic Preservation Act ("NHPA").  In the motion now before the Court, Plaintiff seeks a temporary restraining order ("TRO") prohibiting the two remaining scheduled bus tours in 2014.  For the reasons explained below, the Court denies Plaintiff's motion.

FACTS[1]

The Yakima Nation is a federally recognized Indian Tribe. Defendant USFWS is responsible for administration and management of certain federally

_____

[1] Unless otherwise indicated, the following facts are primarily drawn from Plaintiff's complaint and documents appended to the instant motion, and are accepted as true for the purposes of this motion.

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER ~ 2

owned lands, including those lands comprising the National Wildlife Refuge system and Hanford Reach National Monument. Defendant Robyn Thorson is the Regional Director of the Pacific Region of the USFWS and is named in her official capacity. Defendant Charles Stenvall is the Manager of the USFWS Mid-Columbia National Wildlife Refuge Complex and is named in his official capacity. Defendant Larry Klimek is the USFWS Manager of the Hanford Reach National Monument and is named in his official capacity.

Rattlesnake Mountain, overlooking the Hanford Site in Benton County, Washington, is known to the Yakama Nation as *Laliik*, and means "standing above the water." Laliik has cosmological, religious, and cultural significance for the Yakama Nation and other Indian tribes. The Yakama Nation ceded the land on which Laliik is situated to the United States under the Treaty of 1855. From 1943 through 1987, the United States used the area as a buffer zone for the Hanford Site. In 1967, the Atomic Energy Commission formally designated the western sector of the Hanford Site, including Laliik, as the Arid Lands Ecology Reserve ("ALE"). In 1977, the Department of Energy took control of the Hanford site, including ALE. In 1997, administration and management of the mountain was transferred to USFWS, and it was subsequently included in the Saddle Mountain National Wildlife Refuge.  Ultimately, the area was included in the Hanford Reach National Monument, pursuant to the Antiquities Act of 1906. In 2007, Laliik was designated

as a Traditional Cultural Property ("TCP") pursuant to §101(d)(6)(A) of the

National Historic Preservation Act ("NHPA"). A TCP is a "property of traditional

religious and cultural importance to an Indian tribe" and is thereby eligible for

listing on the National Register of Historic Places.

USFWS has maintained the public access restriction to the area that began in

1943 when the military and later the Department of Energy managed the area,

using fences, locked gates, and policy to restrict access to authorized uses,

according to the June 2012 report on wildflower tours. ECF No. 21-1 at 8.

On February 17, 2012, USFWS emailed the Yakama Nation with a request

for a review of a proposed undertaking pursuant to § 106 of the NHPA. The

undertaking consisted of two three-hour guided bus tours on one day on Laliik for

the public to view the spring wildflowers. On March 13, 2012, the Yakama Nation

responded that it did not concur under the NHPA. On April 26, 2012, USFWS

issued a finding that the wildflower tours presented "no adverse effect" on the

Laliik TCP.  On April 30, 2012, State Historic Preservation Officer Allyson

Brooks notified the USFWS that she did not concur with the finding of no adverse

effect. On May 1, 2012, USFWS sent a cultural review of the wildflower tours to

the State Historical Preservation Office and Yakama Nation for comment,

documenting the finding of no adverse effect and stating that "as a potential threat

to the integrity of Laliik's feeling and association, the wildflower tour is fleeting."

On June 7, 2012, USFWS notified the Yakama Nation that it was expanding the proposal for future wildflower tours at the Laliik TCP to six tour days per year (two tours per day) for the next five years. The § 106 review contained the same information regarding potential effects and the same finding of no adverse effect. USFWS informed the Tribe that it would have the Advisory Council on Historic Preservation review the new proposal because the Tribe and the State Historical Preservation Office had not concurred with the USFWS.  On December 6, 2012, the Tribe told the ACHP that it did not concur with the new tours proposal. On December 28, 2012, the ACHP gave the USFWS detailed comments on a proposed elk hunt on Laliik, but did not comment on the wildflower tours. It did, however, specify the need to manage all projects on the TCP to mitigate adverse effects.

On January 17, 2013, Defendant Robyn Thorson met with the Yakama Tribal Council regarding a number of matters; consultation for the wildflower tours was scheduled for that meeting, but the discussion did not take place due to time constraints.

On February 13, 2013, USFWS told the Chairman of the Tribal Council that USFWS had met its NHPA § 106 consultation obligations and would proceed with the wildflower tours in May 2013, managed in a way that would produce "no adverse effect."

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER ~ 5

On March 26, 2013, a representative from the Yakama Nation met with Charles Stenvall and Larry Klimek and expressed that the Tribe objected to the expanded wildflower tours. Defendants reiterated to him that USFWS had met all NHPA obligations and were proceeding with the wildflower tours.  The Tribe again objected to the finding of no adverse effect in a letter to the Acting Assistant Interior Secretary for Fish and Wildlife and Parks. In response, Acting Assistant Secretary Jacobson stated that USFWS had met all NHPA § 106 obligations and that there would be no adverse effect if all work controls and project modifications were followed.

USFWS conducted four wildflower tours at the Laliik TCP over the course of two days, May 1 and May 4, 2013.

On May 16, 2013, the Tribe notified Jacobson that USFWS never conducted government-to-government consultation on the expanded tour.

On January 16, 2014, USFWS's website linked to articles and photos from the 2013 tours that the Tribe claims indicate that the USFWS had not followed the work controls. On February 3, 2014, Yakama Nation staff members met with ACHP members in Washington, D.C., regarding the adverse effects to Laliik. On April 9, 2014, the ACHP recommended to USFWS that it consult further with the Tribe prior to any further wildflower tours on the Laliik TCP, citing the allegedly unfollowed work controls and the Tribe's belief that there was an adverse effect.

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER ~ 6

HRNM management told the Yakama Nation that the USFWS had made a final agency decision to proceed with eight wildflower tours, scheduled for April 25 and 27, and May 8 and 10, 2014. The Yakama Nation filed a complaint in this Court on April 22, 2014. On April 28, after the first two days of tours occurred, the Tribe moved the Court for a temporary restraining order prohibiting the tours scheduled for May 8 and 10, 2014.

DISCUSSION

The Yakama Nation maintains that USFWS did not adequately consult with it on a government-to-government basis before approving the wildflower tours and finding that they presented no adverse effect to the Laliik TCP, as required under NHPA § 106. They maintain that a temporary restraining order is justified, prohibiting the USFWS from conducting the two remaining scheduled wildflower tours on May 8 and 10, 2014, pending the USFWS's proper consultation with the Tribe.

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Court may grant preliminary injunctive relief in order to prevent "immediate and irreparable injury." Fed.R.Civ.P. 65(b). The analysis for granting a temporary restraining order is "substantially identical" to that for a preliminary injunction. *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.,* 240 F.3d 832, 839 fn. 7 (9th Cir. 2001*)*. It "is an extraordinary remedy never awarded as of right." *Winter v.*

*Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain this relief, a plaintiff must establish that (1) he is "likely to succeed on the merits," (2) he is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Id.* at 20. "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id*. at 24 (citing *Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 542 (1987)). The Ninth Circuit uses a "sliding scale" under which the temporary restraining order may be issued if there are serious questions going to the merits and the balance of hardships tips sharply in the plaintiff's favor, along with satisfaction of the two other *Winter* factors. *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011) ("For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits.").

### A. Likelihood of Success on the Merits

The Court's review of agency action under the NHPA is governed by the Administrative Procedure Act. Under 5 U.S.C. § 706 the Court is directed to compel agency action that has been unlawfully withheld, (§ 706(1)), and hold unlawful and set aside agency actions it finds to be "arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law" (§ 706(2)(A)), or "without

observance of procedure required by law" (§ 706(2)(D)). The burden is on the Tribe to show any decision or action was arbitrary and capricious. *Kleppe v. Sierra Club,* 427 U.S. 390, 412 (1976). Agency action will be upheld if the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). An agency's decision can be upheld only on the basis of the reasoning in that decision. *Anaheim Memorial Hospital v. Shalala*, 390 F.3d 630, 638 (9th Cir. 2004). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency," but "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). An agency decision may be reversed under the arbitrary and capricious standard if the agency "relied on factors that Congress did not intend it to consider, or offered an explanation for its decision that runs counter to the evidence or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise*." Snoqualmie Indian Tribe v. Federal Regulatory Commission*, 545 F.3d

1207, 1212 (9th Cir. 2008) (citing *Sierra Club v. EPA*, 346 F.3d 955, 961 (9th Cir. 2003)).

1. *Consultation*

Under NHPA Section 106 (16 U.S.C. § 470f) and its implementing regulations, USFWS is required to consult with the Tribe before spending money on or approving any federally-assisted undertaking such as the project at issue here. The consultation process is governed by 36 C.F.R. § 800.2(c)(2), one of § 106's implementing regulations. In the consultation,

> [t]he agency official shall ensure that consultation in the section 106 process provides the Indian tribe or Native Hawaiian organization a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects.

36 C.F.R. § 800.2(c)(2)(ii)(A). Furthermore, the consultation "must recognize the government-to-government relationship between the Federal Government and Indian tribes" and is to be "conducted in a manner sensitive to the concerns and needs of the Indian tribe." § 800.2(c)(2)(ii)(C). However, "[i]f within the 30 day review period the SHPO/THPO or any consulting party notifies the agency official in writing that it disagrees with the finding and specifies the reasons for the disagreement in the notification, the agency official shall either consult with the party to resolve the disagreement, or request the Council to review the finding

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER ~ 10

1    pursuant to paragraphs (c)(3)(i) and (c)(3)(ii) of this section." 36 C.F.R.

2    § 800.5(c)(2)(i). The code further provides:

3        When a finding is submitted to the Council pursuant to paragraph (c)(2)(i) of
         this section, the Council shall review the finding and provide the agency

4        official and, if the Council determines the issue warrants it, the head of the
         agency with its opinion as to whether the adverse effect criteria have been

5        correctly applied. A Council decision to provide its opinion to the head of an
         agency shall be guided by the criteria in appendix A to this part. The Council

6        will provide its opinion within 15 days of receiving the documented finding
         from the agency official. The Council at its discretion may extend that time

7        period for 15 days, in which case it shall notify the agency of such extension
         prior to the end of the initial 15 day period. *If the Council does not respond*

8        *within the applicable time period, the agency official's responsibilities under*
         *section 106 are fulfilled.*

9

10   36 C.F.R. § 800.5(c)(3) (emphasis added).

11          Despite the Tribe's contention that USFWS did not consult as required under

12   applicable law, the complaint and documentation submitted evidences a back-and-

13   forth exchange between USFWS and Tribal representatives. The June 2012 Section

14   106 report states,

15       The FWS has consulted with the cultural resource staff and the leaders of the
         Yakama Nation, Confederated Tribes of the Umatilla Indian Reservation

16       (CTUIR), the Nez Perce Tribe, and the Wanapum (collectively referred to as
         the "Tribes" in this report) on the undertaking, APE, and potential effects of

17       the wildflower tour on historic properties. The consultation included a
         meeting at the FWS office in Burbank, Washington, on February 2, 2012

18       and a written/email correspondence from the FWS to the Times on February
         17, 2012….The FWS has modified the original tour concept in response to

19       concerns raised by the Tribes. Modifications included limiting group size,
         limiting the area traversed at the stops, and keeping the group together and

20       under the immediate control of the FWS tour leader.

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY
RESTRAINING ORDER ~ 11

1    ECF No. 21-1 at 4.  Emails indicate that the USWFS communicated with the tribe,

2    including Harry Smiskin, Chairman of the Yakama Nation Tribal Council, offering

3    the Tribe a "reasonable opportunity" to respond. A March 13, 2012, email from

4    Rose Ferri states that the Yakama Nation "cannot concur" with the undertaking,

5    "as it would constitute [an] adverse effect to the Laliik TCP." ECF No. 7 at 11. An

6    April 26, 2012, letter to Chairman Smiskin requests review of the USFWS report

7    on the wildflower tours. ECF No. 7 at 14.  As USFWS Historical Preservation

8    Officer Anan Raymond stated in a letter November 16, 2012, regarding the

9    approval for the more extensive tours over the course of five years, the consulting

10   parties indicated that the additions to the original 2012 tour proposal did not

11   change their objections to the tour. Thus, USFWS appears to have consulted the

12   Tribe regarding the second round of tours.

13           The Tribe argues that the consultation was inadequate, citing the request of

14   Harry Smiskin, Chairman of the Yakama Nation Tribal Council, for a government

15   to government consultation with the USFWS in a letter dated March 22, 2013. ECF

16   No. 7-1 at 9. Smiskin had previously stated that government-to-government

17   consultation had not taken place in the past because no staff member was

18   authorized to make decisions for the Tribal Council. ECF No. 7-1 at 6. Principal

19   Deputy Assistant Secretary of the Interior Rachel Jacobson replied to Smiskin's

20   March 22 letter by stating that the USFWS had met its regulatory requirements to

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY
RESTRAINING ORDER ~ 12

consult consistent with § 106, pointing to the modifications to the tour, including

limiting group size, limiting the area traversed at stops, and keeping the group

together and supervised. ECF NO. 7-1 at 11.  The Government argues that USFWS

consults with the Hanford Area Tribes (including the Yakama Nation,

Confederated Tribes of the Umatilla Reservation, Nez Perce Tribe and the

Wanapum Band) regularly in the manner it did for the wildflower tours. ECF No.

23 at 3. In practice, USFWS transmits information and findings concerning

undertakings separately to each tribe by letter, email and personal exchange—a

practice established by the Department of Energy two decades ago, according to

the Government. *Id*. USFWS acknowledges that this process is not codified by a

charter or agreement document. *Id*.

Given the lack of formal consultation procedure between the USFWS and

the Tribe, and the fact that there was significant communication between the

USFWS and the Tribe regarding the tours, the Court does not find that, for the

purposes of the motion now before the Court, the Tribe is likely to succeed on the

merits of its claim that it was inadequately consulted about the tours.

Furthermore, the evidence indicates that USFWS followed the correct

procedure for occasions when there is disagreement about a proposed course of

action. As Anan Raymond's declaration indicates, the USFWS's November 2012

transmittal and report requested that the Advisory Council on Historic Preservation

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY
RESTRAINING ORDER ~ 13

review the Service's determination of no adverse effect. ECF No. 21 at 5; ECF No. 7 at 18 (November 16, 2012 letter from USFWS to the Advisory Council on Historic Preservation explaining the Tribe's dispute with the finding of no adverse effect and their inability to come to a resolution). Raymond's declaration states that the Council did not respond to USFWS within the time prescribed by 36 C.F.R. 800.5, and when contacted, the Council representative stated that the Council had no plans to respond. *Id*. An April 9, 2014, letter from the Advisory Council indicates that it did not respond to USFWS's request for resolution of the dispute. ECF No. 7-1 at 5. While it does reference a letter dated December 28, 2012, regarding an advisory opinion that the "historic qualities exhibited by Laliik and its integrity of setting, feeling, and association for the tribes may be compromised by the proposed elk hunts," The council acknowledges that "[a]t the time it did not opine on whether the wildflower tours would constitute an Adverse Effect." *Id*. Additionally, the April 9, 2014, letter from the Council indicates that its letter about the elk hunts was dated after the responsive time period had elapsed. *Id*. Thus, there are numerous indications—from the Tribe's evidence and the Government's—that the USFWS followed the consultation procedure outlined in the C.F.R.s.

///

///

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER ~ 14

    2.  *Finding of adverse effects*

    The Tribe contends that the finding of no adverse effects was arbitrary and capricious for several reasons. First, the Tribe argues that the USWFS expanded the number of tours into an annual activity that will occur for five years. ECF No. 19 at 15. As such, the Tribe argues, the once "fleeting intrusion" reflected in the report may have a more invasive and destructive potential than first anticipated. *Id*. The Tribe argues that under the APA, this is a relevant factor that the USFWS "utterly failed to consider" in its reasoning behind the "no adverse effect" finding. *Id*. at 16.  The Tribe contends that "the April 2012 and the June 2012 Section 106 Review have no rational connection with each other," but even if the Court finds that they do, the decision is arbitrary and capricious because the proposal has changed significantly. *Id*. Second, Plaintiff argues that evidence from the USFWS website indicates that adverse effects occurred on the May 2013 wildflower tours. *Id*. Third, the Tribe argues that USFWS never looked at alternatives to the location of the wildflower tours in areas of the HRNM that were not as culturally sensitive. *Id*. at 17. The Tribe contends that this is a "relevant factor" which the USFWS failed to consider in the Section 106 review. *Id*.

    Under 36 C.F.R. § 800.5, the "agency official must apply the criteria of adverse effect to historic properties within the area of potential effects." "An adverse effect is found when an undertaking may alter, directly or indirectly, any

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY
RESTRAINING ORDER ~ 15

of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1). Examples of adverse effects include:

> (i) Physical destruction of the property; (ii) Alteration of a property…; (iii) Removal of the property from its historic location; (iv) change of the character of the property's use or physical features within the property's setting that contribute to its historic significance; (v) introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features; (vi) Neglect of a property which causes its deterioration…; (vii) Transfer, lease or sale of property….

36 C.F.R. §800.5(a)(2).

First, given the record before the Court, the only significant change between the Section 106 report from April 2012 and the Section 106 report from June 2012 is the number of people. It is reasonable to conclude that the precautions and reasoning that the USFWS determined would be sufficient for two tours in 2012 (ECF No. 6-1 at 3) would also be sufficient for up to 12 tours a year for five years (ECF No. 21-1 at 3. Though larger in number, the overall effect is similar in that the tours are short (three hours), do not involve any permanent structure, and would both be subject to the same controls, including keeping the bus on the roads, limiting the walking range to 100 meters, and supervising the tourists. *See* ECF No. 21-1 at 3-4. Thus, the transfer of reasoning from two tours to twelve tours has not been shown to be arbitrary and capricious on this record.

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER ~ 16

Nor has it been shown on this record that the 2013 tours had an adverse effect. For its argument, the Tribe cites a photograph from the USFWS website on the tours of a rock cairn described as sacred and culturally significant. But evidence submitted by the Government indicates somewhat persuasively that the rock cairn's provenance was very recent and does not represent a prehistoric or historic archaeological site. And the Tribe has not shown, at least in the context of this motion, how the temporary presence of other people or photography "alters…the characteristics of [the]historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting materials, workmanship, feeling or association." *See* 36 C.F.R. § 800.5(a)(1).

Third, evidence submitted by USFWS indicates that the Rattlesnake Mountain site "provides an ecological setting that allows for unique expression of plant communities" due to climate, soil, and elevation not represented elsewhere on the reserve. Declaration of Larry Klimek, ECF No. 22 at 3-5.  The 2012 wildflower tours were conducted outside of the Laliik TCP on Yakima Ridge, and, according to the Declaration of Larry Klimek, "were not of the same quality" as the 2013 wildflower tours, indicating that the USFWS had considered alternatives at the time it issued the June 2012 report.

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER ~ 17

1    Thus, the evidence before the Court does not support a finding that the

2    agency's decision was arbitrary and capricious.

3    **B. Irreparable Harm**

4    Having concluded above that the USFWS finding of no adverse effect was

5    likely not arbitrary or capricious or unlawful, the Court likewise concludes that the

6    finding of no adverse effect indicates that there is little likelihood of irreparable

7    harm.

8    The Tribe's briefing and oral argument simply failed to establish a basis for

9    finding that irreparable harm would likely occur by allowing the final two days of

10   tours in 2014 to continue as scheduled. First, Plaintiff's counsel stated during oral

11   argument that the large number of tourists would inevitably harm the environment

12   and artifacts on the mountain, estimating the number over the course of five years

13   at 1,500 people. But the TRO motion requests an order preventing *two* days of

14   scheduled tours in 2014, which, by the Court's calculation, would involve

15   approximately 100 people.  Other than numbers, Plaintiff does not articulate how

16   the presence of people on the mountain would irreparably harm its value to the

17   Tribe or its character as a TCP.

18   Furthermore, Plaintiff did not identify and articulate any specific harms that

19   arose out of the tours that took place in 2013, citing again the general negative

20   effects on the environment and spiritual experience of the Tribe. The Tribe cites

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY
RESTRAINING ORDER ~ 18

the photographs from the USFWS website as evidence that USFWS was not following the work controls, but the photographs indicate a news media member photographing or filming a flower, and a photo of a rock cairn without other people visible in the photo. USFWS submitted a declaration stating that an archaeologist determined that the rock cairn pictured on the site was of recent origin, and not a historic or prehistoric archaeological site. ECF No. 21 at 6. Plaintiff contends that damage to environmental resources is usually considered irreparable, but as all driving will take place on already established roads, and the tourist themselves will be supervised and kept in a contained area around the bus, the Court fails to see how their presence will irrevocably damage the environment. As the 2012 report indicates, the area will not be opened to unfettered public access. The USFWS Cultural Resource Compliance report on the wildflower tours, updated June 2012, emphasized the transitory nature of the tours. ECF No. 21-1 at 12.  The tours are designed to be temporary and controlled, and to leave no physical trace. USFWS has stated that it took measures to prevent harm to the specific artifacts of spiritual and cultural significance. *See* ECF No. 21-1 at 8-10. Without more, Plaintiff has not adequately supported its claim that the mere physical presence of other people on the TCP will do irreparable harm.

The Court is sensitive to the Tribe's argument that the presence of tourists negatively impacts the spiritual tenor of the place and may conflict with the Tribe's

1    First Flood ceremonies. But, as it stated in the 2012 report, the USFWS has

2    indicated that it is willing to conduct the tour on days that do not coincide with

3    Tribal cultural activities.

4          **C. Balance of the Equities and the Public Interest**

5          Nor does the Court find that the last two *Winters* factors militate for issuance

6    of a TRO. First, the balance of the equities does not tip strongly in favor of

7    issuance of a TRO. Though the Tribe certainly has a strong interest in preservation

8    of its culture and spiritual interest, the public also has an interest in being allowed

9    to see and experience the land, as long as precautions are taken to preserve the

10   nature of the place. Without a clearer articulation about how the tours harm that

11   experience—limited as they are in time and scope—the Court perceives no strong

12   tip of the balance of equities such that a TRO/preliminary injunction is warranted.

13   Similarly, prohibiting the final two wildflower tours appears to weigh against

14   public interest, as the wildflower tours represent a rare chance for the public to

15   have access—in a limited way—to this area.

16         The Court notes that relevant case law supports the denial of a TRO under

17   these circumstances. A fairly recent Ninth Circuit case, for example, rejected an

18   argument that use of artificial snow consisting of recycled wastewater on a

19   mountain sacred to certain Indian tribes violated the Religious Freedom Act, the

20   National Environmental Policy Act, or the National Historical Preservation Act.

*Navajo Nation v. United States Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc). The court noted that:

> the sole effect of the artificial snow is on the Plaintiffs' subjective spiritual experience. That is, the presence of the artificial snow on the Peaks is offensive to the Plaintiffs' feelings about their religion and will decrease the spiritual fulfillment Plaintiffs get from practicing their religion on the mountain. Nevertheless, a government action that decreases the spirituality, the fervor, or the satisfaction with which a believer practices his religion is not what Congress has labeled a "substantial burden"—a term of art chosen by Congress to be defined by reference to Supreme Court precedent—on the free exercise of religion. Where, as here, there is no showing the government has coerced the Plaintiffs to act contrary to their religious beliefs under the threat of sanctions, or conditioned a governmental benefit upon conduct that would violate the Plaintiffs' religious beliefs, there is no "substantial burden" on the exercise of their religion.

> Were it otherwise, any action the federal government were to take, including action on its own land, would be subject to the personalized oversight of millions of citizens. Each citizen would hold an individual veto to prohibit the government action solely because it offends his religious beliefs, sensibilities, or tastes, or fails to satisfy his religious desires. *Further, giving one religious sect a veto over the use of public park land would deprive others of the right to use what is, by definition, land that belongs to everyone.*

> "[W]e are a cosmopolitan nation made up of people of almost every conceivable religious preference." *Braunfeld v. Brown,* 366 U.S. 599, 606, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). Our nation recognizes and protects the expression of a great range of religious beliefs. Nevertheless, respecting religious credos is one thing; requiring the government to change its conduct to avoid any perceived slight to them is quite another. No matter how much we might wish the government to conform its conduct to our religious preferences, act in ways that do not offend our religious sensibilities, and take no action that decreases our spiritual fulfillment, no government—let alone a government that presides over a nation with as many religions as the United States of America—could function were it required to do so.

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY
RESTRAINING ORDER ~ 21

*Navajo Nation v. U.S. Forest Serv.,* 535 F.3d at 1063-64 (some internal citations omitted) (emphasis added). Thus, while the Tribe's interest in preserving Laliik for cultural and spiritual experiences is very important, the Court cannot, without more, foreclose others who want to experience the mountain's uniqueness from sharing that space.

The Court reiterates that this is not a decision on the merits; simply a finding that the record before the Court does not support the issuance of such a "drastic remedy" as a TRO provides.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

Plaintiff's Motion for a Temporary Restraining Order (ECF No. 6) is **DENIED.**

The District Court Executive is hereby directed to enter this Order and provide copies to counsel.

**DATED** May 5, 2014.



THOMAS O. RICE
United States District Judge

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY
RESTRAINING ORDER ~ 22