UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

CONFEDERATED TRIBES AND
BANDS OF THE YAKAMA
NATION,

                    Plaintiff,

    & 

CONFEDERATED TRIBES OF THE
UMATILLA INDIAN
RESERVATION,

              Intervenor-Plaintiff,

    v.

UNITED STATES FISH AND
WILDLIFE SERVICE, et al.,

              Defendants.

NO:  1:14-CV-3052-TOR

ORDER ON CROSS MOTIONS FOR
SUMMARY JUDGMENT

//

//

//

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 1

BEFORE THE COURT are the following motions: Umatilla Tribes' Motion for Summary Judgment (ECF No. 49), Yakama Nation's Cross-Motion for Summary Judgment on the Record (ECF No. 50), and United States' Cross-Motion for Summary Judgment and Combined Response to Plaintiff and Plaintiff-Intervenor's Motions for Summary Judgment (ECF No. 52). These matters were heard at a telephonic hearing on March 19, 2015. Thomas A. Zeilman appeared on behalf of Plaintiff. Malena Pinkham and Joseph R. Pitt appeared on behalf of Intervenor-Plaintiff. Vanessa R. Waldref appeared on behalf of Defendants. The Court has reviewed the briefing and the record and files herein, heard from counsel, and is fully informed.

## BACKGROUND

Plaintiff Confederated Tribes and Bands of the Yakama Nation ("Yakama Nation") and Intervenor-Plaintiff Confederated Tribes of the Umatilla Indian Reservation ("Umatilla Tribes") seek judicial review of the U.S. Fish and Wildlife Service ("Service") decision approving public wildflower tours within the *Lalíik* Traditional Cultural Property ("TCP"). Specifically, Plaintiffs allege that (1) the Service violated the consultation provisions of the National Historic Preservation Act ("NHPA"), and (2) the Service's "no adverse effect" finding was arbitrary and capricious under the Administrative Procedure Act ("APA").

//

## FACTS

### A. *Lalíik* Traditional Cultural Property

*Lalíik*, also known as Rattlesnake Mountain, sits within the Hanford Reach National Monument ("HRNM") in Benton County, Washington. AR 450. A treeless, sub-alpine ridge located 3,600 feet above sea level, *Lalíik* means "standing above the water." AR 452-53, 461, 2074. Associated with practices and beliefs of the Washani, *Lalíik* is a sacred mountain with traditional cultural and religious significance to the local Hanford area tribes: Yakama Nation, Umatilla Tribes, Nez Perce, and Wanapum Band. AR 461-64, 1972, 2074-75.

*Lalíik* is located within lands ceded to the United States under the Treaty of 1855 and has maintained varying land use designations throughout the past several decades. AR 450. In 1943, the U.S. Department of War seized the area through eminent domain for use as a buffer for plutonium production at the Hanford site. AR 450. In 1967, the Atomic Energy Commission designated the area around Rattlesnake Mountain as the Arid Lands Ecology Reserve ("ALE") to be preserved for desert ecology research and education, and in 1971, the area was established as a Research Natural Area.[1] AR 451. In 2000, *Lalíik* became part of the HRNM

---

[1] "[Research Natural Area] is a physical or biological unit (or both) in which natural conditions are maintained insofar as possible by letting natural physical and biological processes prevail without human intervention." AR 451.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 3

pursuant to the Antiquities Act of 1906, and thus came under the administration

and management of the U.S. Fish and Wildlife Service ("Service").  AR 451.

In 2007, the U.S. Department of Energy designated *Lalíik* a Traditional

Cultural Property ("TCP") pursuant to the National Historic Preservation Act,

making the area eligible for listing on the National Register of Historic Places.  AR

2074; *see* AR 445-76.  The designation relied upon the status of *Lalíik* as a

"spiritual location of primary importance to groups of American Indians within the

region," AR 460:

> [*Lalíik*] continues to figure prominently not only as a place recognized
> to have extreme cultural and sacred significance, but also as a place
> where practitioners can go to continue and perpetuate their traditional
> beliefs. *Lalíik* retains integrity of condition as it remains relatively
> unblemished, retaining integrity of habitat and where culturally
> important plants are accessible. More importantly, *Lalíik* also retains
> integrity of association with tribal cultural beliefs and practices.

AR 461.  Public access to the area has been restricted since 1943 and remains so to

this day, with the Tribes retaining continued access and use.  AR 450, 2075.

**B. Service's Proposed Undertakings**

Beginning in 2010, the Service began consulting with the Hanford area

tribes, including the Yakama Nation and Umatilla Tribes, about organizing limited

public access tours of *Lalíik* TCP.  In September 2010, the Service proposed a

public appreciation tour of *Lalíik* to commemorate the 10th Anniversary of the

HRNM.  AR Nos. 402, 404.  The proposal involved an agency-led, 20-person bus

tour to the top of Rattlesnake Mountain on a single day in early October 2010.  AR
404.  The tour group would remain at the top of the mountain for no more than 40
minutes while the participants discussed, *inter alia,* the importance of the area to
the Tribes, the shrub steppe ecology, and habitat restoration.  AR 404.  The Tribes
voiced their opposition to the tour, and the Service subsequently abandoned the
proposal.

In January 2011, the Service announced a new proposal for a tour of *Laĺíik*
TCP, calling it the "Shrub Steppe Restoration Workshop Tour."  AR No. 308.  The
proposal consisted of four bus tours to be conducted on a single day in April 2011
and guided by a Service biologist.  AR No. 308.  The bus would stop at four select
locations along the route for approximately 20 minutes, while the 30 passengers of
each bus could disembark and examine vegetation and wildlife habitat within 150
meters of the road.  AR No. 308.

The Service sent the proposed undertaking via email to the Tribes for
comment and discussed the proposal at the January 26, 2011 Hanford Tribal
Working Group meeting.  AR No. 307; AR 1906-11.  Yakama Nation
communicated its opposition to the tour at the meeting.  ECF No. 51 ¶ 12.  On
February 8, 2011, the Service sent a letter regarding the proposed shrub-steppe tour
to each interested tribe, including Yakama Nation and Umatilla Tribes, requesting
their review and comments pursuant to Section 106 of the NHPA.  SAR 2-4; AR

1906-11. Both Yakama Nation and Umatilla Tribes voiced their opposition. SAR 11-01 at 1-2; AR 1924. On April 26, 2011, in a written report regarding the proposal, the Service determined it would not conduct the undertaking. AR 1929-38.

In February 2012, the Service proposed a third undertaking. First in a meeting with the Tribes at the Service's office in Burbank, Washington, and then via email, the Service proposed public wildflower tours within the *Lalíik* TCP and invited the Tribes' review. AR 1968-69, 1979, 2068. The undertaking was a proposal to conduct two, three-hour guided bus tours within the *Lalíik* TCP for fifty members of the public to view spring wildflowers. AR 1962-66, 1972-76. These two tours would be conducted by the Service within a single day either in late April or early May. AR 1962-66, 1972-76. Yakama Nation voiced its opposition to the undertaking, stating that "the nature of [*Lalíik's*] cultural significance is not conducive to tourism and recreation and will adversely affect the TCP." AR 1981-82. Similarly, Umatilla Tribes opposed the proposal due to the potential adverse effect the tour would have on the *Lalíik* TCP. SAR 12. The relevant parties discussed the proposed undertaking at the April Tribal Working Group meeting, with the Service indicating that it "w[ould] go no adverse effect." AR 1989-91.

//

**C. No Adverse Effect Finding**

On April 26, 2012, the Service issued a Section 106 Cultural Resource Compliance Report, determining that the proposed undertaking—two guided wildflower bus tours on a single Saturday in late April or early May—would have "no adverse effect" on the *Lalíik* TCP.  AR No. 121.  In concluding that the proposed undertaking would not "diminish the integrity of setting, feeling, or association" of the TCP, the report states the following:

> The TCP is a significant spiritual and cultural landscape in a vast, isolated natural habitat that is relatively free of modern development and public access.  The Tribes explain that a public wildflower tour at *Lalíik* would diminish its sacred qualities and upset their association with this important place. However, the wildflower tour is a transitory event. Like a jet and its contrail high over a wilderness area, the wildflower tour is a fleeting intrusion.  Furthermore (and unlike a jet and contrail which is indifferent to the value of wilderness), the wildflower tour is a minimum impact activity designed to instill appreciation of the place and its natural resources.
>
> . . . .
>
> The undertaking is an FWS-controlled and guided tour of wildflowers and associated resources. The undertaking does not open the Rattlesnake Unit to uncontrolled and unfettered access by the public. In addition, the undertaking does not alter the physical or tangible characteristics of the *Lalíik* TCP. It does not alter the Tribes' ability to access the Rattlesnake Unit for traditional cultural and religious purposes. And, as a potential threat to the integrity of *Lalíik's* feeling and association, the wildflower tour is fleeting.

AR No. 121 at 11-12.

//

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 7

On April 30, 2012, the Washington State Historic Preservation Officer ("SHPO") sent a letter to the Service indicating that it did not concur with the Service's no adverse effect finding.  AR 2004.  On May 2, 2012, the Umatilla Tribes reiterated its opposition to the proposed undertaking, voiced its disagreement with the Agency's no adverse effect finding, and requested various explanations regarding the undertaking.[2]  SAR 14-15.  On May 5, 2012, the Service conducted two "pilot" guided public wildflower tours within the HRNM, but outside the *Lalíik* TCP boundary.  AR 2006-09, 2023-26.  According to the Hanford Tribal Working Group meeting agenda, the Tribes and Service discussed the proposed undertaking in the May 10, 2012 meeting.   AR 2016.

**D. Expanded Program of Wildflower Tours**

On June 7, 2012, the Service updated its April 26, 2012 Section 106 Compliance Report, expanding the wildflower undertaking from a two tours on a single day in 2013 to a program of up to twelve tours per year—two tours on six different spring days—for a period of five years.  AR 2037-38.  The update contained no new information regarding potential effects but similarly determined the expanded undertaking would result in "no adverse effect" to the *Lalíik* TCP.

_____

[2] It is unclear from the record whether Yakama Nation sent notice of its opposition after receiving the no adverse effect documentation.  *See* ECF No 51 at 6-7.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 8

AR 2065-2109.  Moreover, the Service did not reopen consultation with the Tribes

before issuing the updated report.  Under the "Tribal Consultation" section of the

updated report, the Service recounts the previous consultation with the Tribes, all

of which pre-dated the April 2012 report.  AR 2068.  The Tribes were not informed

of the expanded program until after the no adverse effect determination was made.

AR 2039, 2207.

The Service eventually sent the updated report to the Advisory Council on

Historic Preservation ("Council) on November 16, 2012.  AR 2055.  In its letter,

the Agency acknowledged that the report and Section 106 review represents a

slight change to the earlier April 2012 report:

> With this letter and report the FWS has re-identified the undertaking
> as a program of up to six wildflower tours a year for a period of 5
> years . . . All other elements of the undertaking . . . and effect
> determination are the same as identified in the April 2012 exercise.
> While the undertaking has *changed slightly*, the consulting parties
> have indicated that it does not change their objection to the FWS
> determination of no adverse effect.

AR 2056-57 (emphasis added).  In an email dated December 3, 2012, the Council

notified the Service that it would submit its response to the disputed finding by

December 17, 2012, extending the standard response deadline under the

regulations an additional fifteen days.  AR 2121.  However, the Council failed to

submit a response to the Service's report by this date, and, instead issued

comments to another disputed agency undertaking within the *Lalíik* TCP on

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 9

December 28, 2012.  AR 2122-2124.  Although the Council's response addressed activities within the *Lalíik* TCP, it did not address the Service's no adverse effect finding with regards to the wildflower tours undertaking.  AR 2122-2124.

In light of the Council's nonresponse, the Service notified the Tribes that it planned to proceed with the expanded program of wildflower tours in May 2013.  AR 2170-71; SAR 27-01.  Both the Umatilla Tribes and Yakama Nation again objected to the Agency's finding.  SAR 27-02; AR 2245-46.  Specifically, the Umatilla Tribes noted that the Service never initiated consultation regarding the expanded program of tours; rather, the Umatilla Tribes were only consulted about an undertaking for "two tours on a single day in late April or early May."  SAR 27-02 at 1-2.  Nonetheless, the Agency concluded that it satisfied its Section 106 obligations and would proceed with the expanded program of tours.  AR 2518-19.  In early May 2013, the Service conducted four wildflower tours (two tours on both May 1 and May 4) within the *Lalíik* TCP.  AR 2313-18.

In light of "renewed expressions of concern" from Yakama Nation, the Council sent a letter to the Service on April 9, 2014.  AR 2437-38.  Highlighting that *Lalíik's* "remoteness, isolation, and limited access are all important characteristics that contribute to its eligibility [for listing on the National Register] and to its integrity of setting, feeling, and association," the Council advised that all proposed activities for *Lalíik* be treated as potentially having an adverse effect and

be considered under a Programmatic Agreement between the Tribes, Washington's

SHPO, and all other appropriate parties.  AR 2438.

## DISCUSSION

### A. Standard of Review

The APA governs judicial review of agency action under the NHPA.  Under

the APA, a court must uphold an agency action unless it is found to be "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law."  5

U.S.C. § 706(2)(A).  "This deferential standard is designed to 'ensure that the

agency considered all of the relevant factors and that its decision contained no

clear error of judgment.'"  *Pac. Coast Fed'n of Fishermen's Ass'n, Inc., v. Nat'l

Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (citation omitted).

Under this "narrow" standard of review, the court requires that the agency

"examine the relevant data and articulate a satisfactory explanation for its action."

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor

Vehicle Mfrs. Ass'n, v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Specific to statutes that are procedural in nature, a court may also set aside agency

actions that are adopted "without observance of procedure required by law."  5

U.S.C. § 706(2)(D); *see Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 781

(9th Cir. 2006)*; Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157,

1165 (9th Cir. 2003) (applying the "without observance of procedure" standard to

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 11

determine the agency's compliance with NEPA, a statute that provides procedural

safeguards rather than a substantive result).

**B. The National Historic Preservation Act**

"The NHPA involves a series of measures designed to encourage

preservation of sites and structures of historic, architectural, or cultural

significance." *Pit River Tribe*, 469 F.3d at 787.   Among the sites the NHPA is

designed to protect are "[p]roperties of traditional religious and cultural importance

to an Indian tribe . . . [which] may be determined to be eligible for inclusion on the

National Register." 16 U.S.C. § 470a(d)(6)(A).[3]  Procedural in nature, the NHPA

and its accompanying regulations set forth the process an agency must follow

when it plans to implement an undertaking on a protected site.  Section 106 of the

NHPA requires that federal agencies, prior to spending any funds, "take into

account the effect of the undertaking on any district, site, building, structure, or

---

[3] The NHPA was repealed on December 19, 2014, by the National Park Service

and Related Programs Act, Pub. L. No. 113-287, 128 Stat. 3094 (codified in

scattered sections of title 54 of the United States Code), "except with respect to

rights and duties that matured, penalties that were incurred, or proceedings that

were begun before the date of enactment of this Act."  Pub. L. No. 113-287, sec. 7.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 12

object that is included in or eligible for inclusion in the National Register." *Id.*

§ 470f.[4]

> [Both the NHPA and the National Environmental Policy Act] create
> obligations that are chiefly procedural in nature; both have the goal of
> generating information about the impact of federal actions on the
> environment; and both require that the relevant federal agency
> carefully consider the information produced. That is, both are
> designed to insure that the agency "*stop, look, and listen*" before
> moving ahead.

*San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1097 (9th Cir. 2005)
(emphasis added); *see also Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177
F.3d 800, 805 (9th Cir. 1999) ("Section 106 of NHPA is a 'stop, look, and listen'
provision that requires each federal agency to consider the effects of its
programs.").

---

[4] NHPA's successor statute similarly requires that "prior to the approval of the
expenditure of any Federal funds on the undertaking  . . . [the agency] shall take
into account the effect of the undertaking on any historic property."  54 U.S.C.
§ 306108.  Further, the agency "shall afford the Council a reasonable opportunity
to comment with regard to the undertaking." *Id.*  In carrying out this mandate, "a
Federal agency shall consult with an Indian tribe . . . that attaches religious and
cultural significance to property" eligible for listing on the National Register.  *Id.*
§ 302706.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 13

Relevant here are the NHPA's consultation provisions as applied to culturally or historically significant Indian sites. Consultation is defined under the regulations as "the process of seeking, discussing, and considering the views of other participants, and where feasible, seeking agreement with them." 36 C.F.R. § 800.16(f).[5] Under the regulations, if the agency finds a culturally-significant site will be affected by its proposed undertaking, it must notify all consulting parties, including Indian tribes, invite their view on the effects, and assess any adverse effects of the undertaking. *Id.* § 800.4(d)(2). For consultation on properties of significance to Indian tribes, "[t]he agency official shall ensure that consultation . . . provides the Indian tribe . . . a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, . . . articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." *Id.* § 800.2(c)(2)(ii)(A). Further, "[c]onsultation with an Indian tribe must recognize the government-to-government relationship between the Federal government and Indian tribes" and "should be conducted in a manner sensitive to the concerns and needs of the Indian tribe." *Id.* § 800.2(c)(2)(ii)(C). "The federal government owes a fiduciary

_____

[5] Under the NHPA's repealing and successor legislation, "[a] regulation, order, or other administrative action in effect under a source provision continues in effect under the corresponding title 54 provision." Pub. L. No. 113-287, sec. 6(f).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 14

obligation to all Indian tribes as a class;" thus, agencies "must at least show compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." *Pit River Tribe*, 469 F.3d at 788 (internal quotation marks and citations omitted).

If, after consultation with the necessary parties, the agency finds the undertaking will have no adverse effect, it shall notify all consulting parties of the finding and provide them with the relevant documentation. 36 C.F.R. § 800.5(c). If the SHPO or any consulting party notifies the agency, in writing, of its disagreement with the finding, the agency must either consult with the party to resolve the disagreement or request that the Council review the finding. *Id.* § 800.5(c)(2). The Council will then provide its opinion no later than 30 days after receipt of the agency's no adverse effect documentation. *Id.* § 800.5(c)(3). "If the Council does not respond within the applicable time period, the agency official's responsibilities under section 106 are fulfilled." *Id.*

An agency may be required to reopen consultation with interested parties if it decides to alter the undertaking as proposed in the finding. "Implementation of the undertaking in accordance with the finding as documented fulfills the agency official's responsibilities under section 106 and this part." *Id.* However, "[i]f the agency official will not conduct the undertaking *as proposed in the finding*, the agency official shall reopen consultation under paragraph (a) of this section." *Id.*

1    (emphasis added).  In turn, paragraph (a) directs the agency to, once again and in

2    consultation with the SHPO and any interested Indian tribe, apply the adverse

3    effect criteria to the site and consider any views of the consulting parties regarding

4    such effects.  *Id* § 800.5(a).

5        Here, Umatilla Tribes asserts the Service failed to comply with the

6    consultation requirements when, after issuing its April 2012 no adverse effect

7    finding regarding the single tour day, it did not consult with the Tribes regarding

8    the new and expanded program, as proposed in the June 2012 update.  ECF No. 49

9    at 17-20.  In response, Defendants assert that the modification to the original

10   undertaking did not require additional consultation.   Defendants boldly assert that

11   they were not required to re-consult with the Tribes on the updated June

12   undertaking because the Tribes had already voiced their concerns about wildflower

13   tours in the *Lalíik* TCP and have not demonstrated what additional information, if

14   any, they would have provided in regards to the expanded program of wildflower

15   tours.  ECF No. 52 at 11-12 ("The [June 2012] Section 106 Report includes the

16   concerns voiced by the Plaintiffs and other tribes regarding the wildflower

17   tours . . . Plaintiffs do not identify anything missing in the record regarding

18   information they would have provided in response to the additional tours that they

19   had not already provided."); *see also* ECF No. 56 at 6-7.  Put more directly,

20   Defendants see no harm in failing to reinitiate consultation with the Tribes because

1    any consultation would, once again, result in the Tribes' blanket opposition to

2    tours within the *Lalíik* TCP.

3        Defendants rely heavily on the Ninth Circuit's opinion in *Te-Moak Tribe v.*

4    *U.S. Department of Interior*, 608 F.3d 592 (9th Cir. 2010), to support their

5    assertion.  In *Te-Moak Tribe,* the Circuit held that the Bureau of Land Management

6    ("BLM") had satisfied its consultation obligations even though it failed to initiate

7    consultation with the Tribe in a "timely fashion" regarding a project amendment.

8    608 F.3d at 609.  Focusing on the BLM's previous consultation with the Tribe on

9    the original project, the Court noted that the Tribe did "not identify any new

10   information that [it] would have brought to the attention of the BLM had it been

11   consulted *earlier* in the approval process for the Amendment."  *Id.* (emphasis

12   added).  As such, the Tribe failed to demonstrate how earlier consultation would

13   have affected the BLM's ultimate determination.  *Id.*

14       Defendants' reliance on this opinion is inapposite. [6]  First, the relevant

15   regulation considered by the Circuit in *Te-Moak* was 36 C.F.R. § 800.2(c)(ii)(A),

16   _____

     [6] Defendants also cite to an unpublished Ninth Circuit opinion, *Summit Lake*

17   *Paiute Tribe of Nevada v. U.S. Bureau of Land Management*, in support of their

18   assertion that they did not need to reopen consultation. 496 F. Appx. 712, 714-15

19   (9th Cir. 2012). Citing to 36 C.F.R. § 900.2(c)(2)(ii)(A), the Circuit upheld the

20   adequacy of the BLM's consultation, examining both the consultation that was

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 17

which requires that tribal consultation "commence early in the planning process."

Here, Umatilla Tribes is asserting, under 36 C.F.R. § 800.5(d)(1), that the Service

did not reinitiate consultation when it decided it would "not conduct the

undertaking as proposed in the finding," not that the Service failed to initiate tribal

consultation early enough in the process.  Second, the BLM *did* at least attempt to

reopen consultation with the Te-Moak Tribe regarding the amendment before

issuing any decision as to the impact:

> The BLM sent a letter to the Tribe about the Amendment one year
> after the BLM received [the] proposal in July 2003. The BLM noted
> that there was already extensive documentation of traditional, cultural,
> and spiritual use sites within or near the project area, but asked the
> Tribe for help in identifying any additional concerns and in
> developing any alternatives or methods that might eliminate or reduce
> potential adverse impacts. The Tribe did not respond to this letter.

608 F.3d at 597-98.   Here, the Service did not attempt to re-open consultation with

the Tribes or provide any meaningful opportunity for the Tribes to comment on the

expanded program of tours prior to its issuance of the June 2012 no adverse effect

conducted with the initial approval of the project and consultation regarding the

amendment. *Id.* at 714.  Unlike the facts here, nothing in this short memorandum

opinion suggests that the BLM utterly failed to consult with the Tribe on the

modification.  Indeed, a quick review of the supporting appellate briefs

demonstrates that the Tribe was consulted on the amendment, just not early in the

process.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 18

1   finding.  Instead, the Service first informed the Umatilla Tribes of the update after

2   it issued its no adverse effect finding, which report acknowledged that all tribal

3   consultation predated the original April 2012 report.  Taken to its logical extreme,

4   the Service would be excused from NHPA's consultation provisions for all

5   subsequent variations of the original April 2012 proposal because the Tribes have

6   already made their objections to public tours within the *Lalíik* TCP known.  If the

7   "effect" of the undertaking, whether or not it is adverse, is the public's intrusion on

8   the otherwise isolated and sacred setting of the *Lalíik* TCP, surely the Tribes

9   should be afforded the opportunity to provide additional comments and insight

10  when the Service augments this intrusion.

11          In its initial proposal, submitted to each Tribe in February 2012 for Section

12  106 review, the Service proposed two guided bus tours on a single day in late April

13  or early May.  Although the Tribes opposed the undertaking, the Agency found the

14  initiative as proposed would not adversely affect the *Lalíik* TCP; rather, the

15  intrusion from these two tours would be "fleeting" and would not "diminish the

16  integrity of setting, feeling, or association" of the area.  AR No. 121 at 12.

17          Less than two months later, instead of implementing the undertaking as

18  originally proposed, the Service dramatically expanded its scope.  That is, rather

19  than two tours on a single day in late April or early May, the Service would lead up

20  to twelve tours each spring over the next five years.  In what the Service

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 19

characterized as a slight change in the undertaking, the proposal transformed from 2 tours that would permit 50 members of the public to access *Lalíik* on a single spring day in 2013, to one that would involve up to 60 tours, over a period of five years, with up to 1,500 members of the public permitted access to the culturally-sensitive and otherwise isolated site.

This 30 fold increase from "the undertaking as proposed in the finding," 36 C.F.R. § 800.5(d)(1), required the Service to re-invite comments from the consulting parties and reassess whether the expanded program, as newly proposed, would adversely affect the area. *See id.* § 800.2(c)(ii)(A) (requiring consultation which provides the Indian tribe "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, . . . articulate its views on the undertaking's effect of such properties, and participate in the resolution of adverse effects); *id.* § 800.5(a) (directing the Service to consult with the SHPO and any interested Indian tribe and consider their views when applying the adverse effect criteria). The Service failed to adhere to the clear regulatory requirement to reopen consultation and provide the interested parties meaningful opportunity to comment on the new proposal, and as such, violated the NHPA.

Although the NHPA and its accompanying regulations do not mandate a particular substantive outcome, its procedural requirements are obligatory. This

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 20

Court would be derelict in its duties if it failed to enforce the minimal procedural protections guaranteed the Tribes.  True, the Service, after reopening consultation with the parties, may reasonably conclude that the expanded program of wildflower tours will have no adverse effect on the *Lalíik* TCP.  But this hypothetical cannot influence the Court's current analysis.  Instead, the relevant focus is whether the Service complied with the relevant statute and regulations: did the Service "stop, look, listen," and carefully consider tribal input before moving ahead with the greatly expanded undertaking?  Or, instead, did the Service stop, look at past tribal consultations on similar proposals, and inappropriately assume that each Tribe would merely voice its blanket opposition rather than providing additional insight to or suggested mitigation measures for the expanded undertaking?  Because this Court concludes the latter occurred here, the only remedy is to set aside the Agency's no adverse effect finding on the updated proposal and order the Service to reengage in the consultation process before conducting any additional wildflower tours within the *Lalíik* TCP, if it still chooses to pursue the undertaking.

Accordingly, because the Service has not complied with the mandatory procedural requirements leading to its "no adverse effect" finding, on this record such finding is necessarily "arbitrary and capricious" or otherwise "without observance of procedure required by law and must be set aside.

**IT IS HEREBY ORDERED:**

1.  Umatilla Tribes' Motion for Summary Judgment (ECF No. 49) and Yakama Nation's Cross-Motion for Summary Judgment on the Record (ECF No. 50) are **GRANTED in part**.  The Service's Section 106 finding of "no adverse effect" is set aside as arbitrary and capricious or otherwise without observance of procedures required by law and this matter is remanded.  The Service must reopen consultation with each affected Tribe in accordance with relevant provisions of Title 54, United States Code (NHPA's successor statute) and any applicable regulations.  The Defendants are prohibited from implementing the wildflower tour undertaking without first complying with these requirements.

2.  United States' Cross-Motion for Summary Judgment and Combined Response to Plaintiff and Plaintiff-Intervenor's Motions for Summary Judgment (ECF No. 52) is **DENIED**.

The District Court Executive is hereby directed to enter this Order, provide copies to counsel, enter Judgment for Plaintiffs remanding this matter to the Agency for compliance with applicable law, and close this file.

DATED March 20, 2015.



THOMAS O. RICE
United States District Judge

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 22